Thank you, Your Honor. Michael Rubin from the Plaintiffs. This is a case involving bank tellers. If you weren't a good lawyer, we wouldn't be happy to see you back three times. But I will comment that all of the lawyers up to this point, and so I'm putting pressure on you, too, sitting at counsel table. It's been an excellent argument. We appreciate it. Thank you, Your Honor. Judge Gutierrez followed Judge Anello, so this case follows what the court decides to do. There are certain important factual differences, though. Like Judge Anello, the court adopted the first type of holistic analysis, where there was equal weight given to all tasks, regardless of what actually was done for particular lengths of time and how important that was. In this case, the principal factual difference, in addition to the fact that the wrong legal standard was applied, which requires reversing class certification, is that we have evidence that somewhere between 200 and 300 of these tellers actually perform their tasks at the teller counters with Steelcase Criterion teller stools. When Chase came into California, it purchased Washington Mutual. That was 2008. The record shows, it's uncontroverted, that the tellers at Washington Mutual had stools. This was four years after PAGA went into effect. Chase ripped them out. Then Chase started, in addition to keeping the existing WAMU branches, Chase started building others, and its Rule 30b-6 deponents make clear that in each of those, and they're building them at a rate of 50 to 80 per year, according to the record, there are now 958 as of the last deposition of these branches, stools can be used by the cashiers to perform their function. This is one of those cases where you have employees who perform their core common essential, and I'm using the words of the Rule 30b-6 deponents, functions at the teller counters, where the tools and the equipment that they use customarily are within reach, as shown by the photographs that are in the record and confirmed by the testimony of the witnesses. They do have to leave those teller counters periodically, and that's ultimately what the merits question is going to be, but they all leave the teller counters periodically to pick up certain types of checks from the printers. If they've been assigned to ATM duty, they go to the ATM dispenser or the TCD. There are records in this case as well. The teller express transaction records document when people are at their teller counters when they're elsewhere. The declaration of Mr. McInerney demonstrates that there are also records showing when someone is at the TCD machine, when someone is at the ATM machine. So there can be a determination made on a class-wide basis, regardless of what standard the California Supreme Court, if the court grants certification, chooses or this Court ultimately adopts, to determine how much of the job is performed there. But doesn't the district court make a finding here that the difference between tellers precluded a finding of commonality as a fact, as not a factual determination subject to deference? Yes, but I have the same answer. You've got a legal error here, I'm sure. Yeah, well, because if you look at what those differences were, specifically the court focused on time spent getting transaction approval, reconciling the ATM, restocking the teller cash dispenser, walking to the vault, escorting customers to the safe deposit, and removing night deposits. The Rule 30b-6 deponents agreed. That's Michael Andrews and Linda Sibbets. All of those tasks are, they're not tasks where at the teller counter you can't perform your customer service. Michael Andrews, the 30b-6, made very clear that at the teller counter you could perform virtually all of your tasks from stationary position. The legal error was that the judge following Judge Anello looked at what these tellers did when they weren't at the teller counters. So it's like our example of the security guards. If we are correct on the merits that what matters is the amount of time performing core tasks in a stationary position, and that's how you determine whether the nature of the work, the essence of the work, reasonably permits the use of seats, then all of these tellers will prevail unless there are some instances where- Is that 50% plus one, or what's that? It's a jury question. It's a trier fact question. I would not expect the California Supreme Court to apply a number to it. Judge Smith referred to it as holistic. I think it's the good holistic. You look to see whether there's- it's like the cholesterol. I was going to say my doctor said something about good cholesterol. If someone- you weigh very heavily the fact that the experts, not only the ergonomics expert, but the companies- Chase's own 30B6 experts point out that they've used stools. They had stools. The fact that the competitors use stools- the record is uncontroverted that at least three other banks in California, tellers use stools. Those are factors that courts- that the trier fact can determine in a given instance is enough to establish that this job reasonably permits the use of seats. It is true. We don't dispute that tellers move. That in many instances, they have to go to other places to do things, but the evidence shows that if it is a small part of the job and there are long stretches where they're stationary at the teller counter, that should be enough. But that's the ultimate issue in the case. The class certification issue is whether they're sufficiently simulated enough so that common issues will predominate. And that's where we go back to their own Rule 30B6 deponents, because measured under the correct legal standard, their own concession that the most common and most essential tasks can be performed at the teller counter, coupled with the evidence that in fact those tasks are performed there, there's only one instance that Linda Shibbets identified in which a seated cashier was unable to perform her functions, and that was someone who was in a wheelchair and couldn't stand at all and had to have someone else stand. So tell me, what's the common question? The common question is whether, given the policy of not providing seats to non-disabled tellers, the nature of this work that tellers perform at their teller counters reasonably permits the use of seats. But then you say you can't consider what else they do. Judge Smith and I are looking at the statute differently, but I'm conceding that if Judge Smith is right that you can consider it, then we don't think you should be able to, given our construction of the statute. But if you can consider it, then you also have to consider is where those away-from-the-teller-counter tasks fit in to the core essential, their language, tasks that the teller performs at the teller station, and if they're sufficiently separate, if there would be benefit to a teller. This is all about health and comfort. If it would be a benefit to a teller, 16 of the 17 wage orders have this provision in them. The 1976 basis, as I stated earlier, specifically says that this has been enforced over the years by DLSC and the IWC. If it would benefit a worker's health and comfort, if it would achieve the goals the IWC sought to achieve to allow someone to sit periodically, it doesn't mean they have to sit, it doesn't preclude them from standing, but it gives them the chance to rest periodically, that everyone agrees that has tremendous health and safety benefits. It's ultimately a jury question, but if you do consider the other factors, you decide how much time they take, how frequent are they, and you have to look at it through that one pay period perspective, because PAGA, again, is based on a pay period per pay period of time. If there is a shift within a pay period at which it would be reasonable to permit a cashier, I'm sorry, a teller to sit while performing her essential core functions, then there is a violation, that individual is aggrieved, and under the proper standard, whether we win in the end or lose in the end, this should be adjudicated in a single action. Thank you. Judge Smith, did you have something to add? The only thing I was going to say, my conclusion was that because the tellers spend the majority of the time at their teller stations, that counting or thinking about their duties performed away from their teller stations affect the nature of the work was not a true interpretation of the statute. In other words, it seemed to me that the judge here was counting things they did when they weren't at their teller station. I didn't see how that could affect the nature of the work when the majority of the time was spent at the teller station. Then I hear your argument, and then I worry that I've come to the wrong conclusion about that. No, if I understand you, I agree with you. The error was to consider everything, including the work away from the teller station. And when you look to see what he said was different, he was actually focusing more on the merits, really, than the differences. He was focusing on work away from the teller station, which we don't dispute, but that's not the focus of our claim. If I may reserve the rest of the time. Sure. Four minutes and change. Thank you. We had a wonderful congressman from Arizona, Moe Udall, who used to say, you know, everything's been said, but not that we went to Senate yet. So now it's your turn. Carrie Vanell, counsel for Chase. And I would like to address, as we've been focusing on the specific record in this case, a couple of the statements that were made by counsel representing the plaintiffs about our specific record. Because when you look at the arguments taken as a whole this morning, one of the things that the plaintiffs have said over and over is what we really wanted these judges to do is we wanted them to look at all of the tasks that were performed by these individuals and weight them by time and consider them in this kind of matrix formulation. And that's frankly exactly what Judge Gutierrez did on this record that you have before you in the Chase case. There are voluminous citations to the particular amount of time on a percentage basis that individual tellers testify that they spent at their teller station. He did, in fact, consider exactly that evidence. There are 16 or 17 record citations on precisely the point that plaintiffs have faulted Judge Anello for ignoring. The interesting thing about the case for Chase, and really all three of the cases, when you think about this issue of seating, is I think counsel for Plaintiff just used the term long stretches at the teller counter. And that's the question that we not only don't have the answer to with respect to everyone in their putative class, but we can't get the answer to on any sort of representative basis. And that's why Judge Gutierrez's conclusion that the class can't be certified is right. So if you think about what a teller does in terms of the record evidence that's before them, the 30B6 deponent that plaintiffs cite to, Mike Andrews, did say these are the most common transactions that a teller will help a customer with. I mean, we all know that, right? We've been in a bank. You know what kind of transactions you tend to have when you go to the teller window. What he also said about two sentences later in his testimony is, but I can't tell you how often or for how long a teller will leave the teller counter during that transaction for a particular customer. So all transactions are starting at the teller counter, and at some point a certain transaction activity in the computer is happening at the teller counter. But what exactly happens during that transaction and whether and to what extent all of those duties happen at the teller counter, that varies. That's what the 30B6 witness said. That's what the declarations uniformly said. That's the question that varies. And so a teller may, in the course of a transaction, when a customer is standing in front of their window, they may have to go get additional cash. They may need an override from a lead teller or a manager. They might be out of a certain type of check or amount of paper that they need. They might need a money order or a cashier's check. I mean, any number of things that can happen during that transaction, and they leave that teller station and come back. That's obviously not a seated function. Plaintiffs can seat. It's not a seated function. But do they have to be glued to their seat the entire time? I mean, you know, like lawyers. I mean, you probably spend most of your time seated at your desk. Sometimes you get up to get a book. Sometimes you get up to talk to your secretary. So, okay, so they get up to get a check, and then they come back to the teller window. What's the significance of that? Because, Your Honor, it affects whether or not the nature of this work reasonably permits a seat. And because one teller may get up for most of their time at a particular hour, even though they're coming back frequently to the teller station, that may be different in terms of the analysis of the nature of the work than a teller who never leaves their teller station for three or four hours. And plaintiffs can see that. They talked about long stretches of time at the teller station. But you can always come up with differences in every case, and there would never be a certifiable class if we adopted that approach. But it seems if there's evidence that many Chase locations used to have seats when they were Washington Mutual, and many other banks provide seats for the tellers, why isn't it a common question of whether the nature of the work reasonably allows the use of seats? A couple of things, Your Honor. The first question is, is there uniform record evidence about Washington Mutual branches providing seats? And the answer to that question is no. There are declarations on this record where tellers who worked at those very branches when they were Washington Mutual said, we didn't have seats. And so there isn't actually any sort of uniform allegation supported by the record evidence that all of those Washington Mutual branches have seats. There's also been testimony on this record that there were differences in the duties and the way that the tellers performed those duties at Washington Mutual and at Chase. That's why each one of these cases has to be looked at differently. And, Plaintiff, this sort of dovetails into a comment or question that Your Honor had earlier. Some people get seats and some people don't get seats as tellers. I don't – that would be your resolution of this? Some tellers are entitled to seats and some are not. The question in this case is, can you determine the answer to that question on a class-wide basis in this group of tellers? And the answer to that question is no, not on this record evidence. Is it possible that there are tellers at some other financial institution, given the way that they perform their duties, that you could answer that question uniformly? That's quite possible, Your Honor. But that's not possible on the record that Judge Gutierrez had before him in this particular case. And I think this goes to the whole issue of, well, any employer can take a job and add a couple of duties where somebody has to get up or move and then say they don't get a chair. Well, I'm happy. I was going to ask you about that. So – And I – and the answer to that question is, these are the kind of determinations that courts make all the time. That's like looking at the Department of Labor Standards Enforcement in its amicus brief in the Kmart case. It said, do you know what this case is like? This case is like an exemption case, like Vinole or Wells Fargo, or like an independent contractor case. I'm sorry I wrote Vinole and Wells Fargo because it just keeps coming up. And do we – and do we know – like, those are multi-factor tests. Those are tests where you have to look at a conglomeration of job duties or where you have to look at a multitude of factors. And is it possible that some factors weigh in favor of finding independent contractor status and some don't? Yes. Those are determinations in the employment context looking at people's duties that courts make all the time. There's nothing magical about the nature of the work analysis here. There's nothing overly complicated or unusual about what we're asking district courts to do. And one of the questions that you led with this morning was, well, we have these three records before us and we potentially have different conclusions about what to do. That's no different than what happens in the exemption context or the independent contractor context. Just because a job has a common title, like bank teller or cashier, doesn't mean that it's being performed the same way in every employment establishment or that even within a particular employer that it's being performed the same way. And what you have in this particular case is a definitive record showing that there are substantial differences. There are a hundred and some record citations in Judge Gutierrez's opinion. He looked at the record evidence. And what he concluded was, I can't analyze the questions that are important here on this record evidence and come to some sort of class-wide determination. And I wanted to touch on two other things about the specific factual record in this case that were raised by Plaintiffs. One is this issue of the teller express records. So as you might hope and expect, given that most of our money is in a bank somewhere, there are actual records, computerized records of the transactions that you make. And on their reply brief in this case, Plaintiffs introduced some evidence on those teller express records. And what they gave the court was a little over a two-hour snapshot for a particular teller and said, see, there are these records that show, you know, everybody agrees when those time stamps are going in, somebody's standing at their station and putting those particular transactions in. However, when you look at that little over two-hour time stamp records for the particular person that Plaintiffs chose, there's 48 minutes of downtime in gaps longer than, like, 10 minutes. Nobody knows where that teller is or what they're doing. And those are in the big gaps. There's 48 minutes in a little more than two hours. So where was that person? Were they at their teller station? Were they somewhere else in the bank? We don't know the answer to that question. And even within the gaps that are shorter, so customer number one is at 8.05 and then customer number two's transaction is at 8.10, we don't know whether that person was at their teller station between 8.05 and 8.10. We know they might have been there at 8.05 and they might have been there again at 8.10, but we don't know what was happening in the middle of those time stamps. What we have to fill in the gaps of those questions in this case is the statements that were made by declarants on both sides, plaintiffs and defendants, and by the testimony of the plaintiffs in this case. I mean, Ms. Kima Henderson, who was a lead teller, who was one of the named plaintiffs here, her words, she said, I walked all day long back and forth and back and forth and back and forth doing overrides for the tellers. I walked all day long. That's how she described the nature of the work that she performed. And so what Judge Gutierrez did in this particular case was take a look at that record evidence. And he also considered, because the plaintiffs talked a little bit about the fact that Chase did, in fact, extend medical accommodations of chairs to some individuals who would be within the putative class, and that is absolutely true. Chase did that. What plaintiffs left out of that description is the fact that there were a number of cases where Chase denied the request for a medical accommodation because looking at all of the facts and circumstances about that teller's job, they determined that the type of request for receipt that the teller was asking for couldn't be accommodated because the branch was too small, because there wasn't enough coverage, because of the specific duties of that teller. Let me go back to that lead teller issue for a second you were just mentioning. Sure. As I understand it, the judge said there's a difference between lead tellers and tellers. Yes. Okay. Let's talk about tellers. Okay. What's the difference from teller to teller? So the difference from teller to teller is that even tellers may be given duties that we might historically think of as lead teller positions, but even tellers are vault custodians and ATM custodians. Those are not just lead teller duties. So Judge Gutierrez said that is one of the distinctions that's important, but the kind of duties that would require you to move around and thus might affect whether you get a seat are also performed by tellers. Teller Jenny Boo, who put in a declaration that said, I spend up to 70% of my shifts performing vault teller duties at some times. She was away from the teller station performing those duties as a teller, sometimes as much as 70% of the given shift. And so many of the duties that affect the amount of movement  under Section 14A are performed by tellers, even if you were to exclude the lead teller from consideration. I guess what I'm worried about is, you know, you can – I've explored this with Mr. Rubin before. You know, you can find minor variations in anything. This is a large bank with a lot of branches, so you might find some teller someplace, even if you exclude the lead tellers who gets up and does more vault duty than somebody else. If that were the answer, then, you know, we couldn't have any class actions at all, because you could always find some kind of difference. And I'm wondering if you're asking us to kind of focus in on the trees and missing the big forest here, which is we all basically know what regular tellers do, not lead tellers, but regular tellers do. Most of the time, regular tellers stand there and cash checks and process deposits and occasionally will get up and go get a check or maybe let you into the safety deposit box. When you look at the big picture of what they do, everybody knows what a bank teller does. What's wrong with that? Well, because, Your Honor, it's not about what we think our common understanding of what a bank teller does that's important. It's what does the record evidence show that this group of bank tellers actually does. Right, but that's what they do, is what I said they do. I mean, they cash checks. They make deposits. They give you cashier's checks. They may have to get up. They're not physically attached to the chair for eight hours. But who is? Well, that's where the 50 percent gets tricky for me, because let's assume that when they are, when we are dealing with them, the question is could they use a seat at that point with the job. But then the question is if that's 10 percent of what they do, if it's 40 percent of what they do, if it's 50 percent or it's, you know, why wouldn't it be like, okay, you're entitled to sit when you're at the window, but obviously you can't do the rest of your job seated. Because there are statements from, and I think that this answers both of Your Honor's questions, but there are statements from a number of tellers in this case that say that they cannot perform, even tellers who leave their station considerably less than some of the examples we've been talking about, who say I can't perform my duties in a chair. There were individuals who were medically. That's right, and you win. And you win. I mean, after your trial, you win. That's correct, Your Honor, but the question before this Court currently is did Judge Gutierrez commit a clear error or abuse his discretion in relying on the record that was before him, which included and which he cites to the statements from individuals saying they couldn't use that chair in performing what we consider to be those regular teller duties. And there's a variety of reasons why that might be the case. Some of it may be the movement back and forth that we're talking about. Some of it is the fact that for safety and other reasons, the way that the bulletproof glass is arranged at their station makes it so they'd have to get on and off a chair every time a customer approaches their window. Some of it has to do with how the drawers open. And Judge Gutierrez has citations in his opinion to all of those differences that were from the record evidence that support why you can't just look at, well, generally speaking, we know what a teller does and they kind of perform these tasks and that's enough. Because he really drilled down to more detail in terms of what are these folks actually doing and what do they say about what they're doing. My worry with Judge Gutierrez's opinion is not so much about him determining the facts in front of him. I'm trying to figure out what basic misinterpretation of the law he had that would say to me he abused his discretion. And my worry about that is that he concluded that the teller's duties performed away from their teller stations affect the nature of the work when the tellers spend the majority of their time at the teller's desks. Tell me how that is a correct interpretation of the law. Because, Your Honor, if we look at Section 14A and Section 14B. They are mutually exclusive. Section 14A talks about the nature of the work. Section 14B talks about specific duties. I agree. So if we look at the nature of the work, we've got to be talking about the panoply of duties, not just some duties. And what plaintiffs have come in and argued is that, oh, we can see that there's a whole panoply of things that tellers do for which they have to stand out. So we're just going to take that out of the analysis, regardless of how often it's performed or how much time it takes or how much it's integrated into the teller transactions. We think you should excise that from the nature of the work analysis and try to just look at these other specific tasks. That's not what nature of the work is. That's isolating particular duties that you want to focus on. That certainly does suggest that it might improve the merits of a plaintiff's case, but it's not in any way consistent with the language of 14A, which talks about the nature of the work. There has to be a consideration for those duties performed away. Ultimately, there might be a determination. Why, when the majority of the work is at the teller station, what difference does it make what they do when they're other places? If they're 90 percent at the teller station and now we're looking at what they do at 10 percent, how does that affect it? I guess that's my worry. I mean, I'm trying to find use of discretion based on interpretation of the statute, not just on if we're going to give him credit for what he does in his fact finding on these kind of situations, then we go along with him and you can come out different ways. But I worry that he did not reasonably interpret 14A talking about what they do outside of when they're 90 percent at the teller station. Well, Your Honor, I would say a couple of things to that. One is that not everyone testified that they spent 90 percent of their time at the teller station. I understand that. So he looked at all of the testimony that was before him, which was a huge range of time at and away from the teller station, and he said, look, I'm passed with looking at the nature of this job. That's got to include both the time there and the time away. So I'm looking at both pieces and what these witnesses say and what the employer said about both pieces of the job, at the teller station and away from the teller station. He looked at both components of that. And there are numerous citations in the record to numbers like that 90 percent. He considered that, as he should, when looking at the nature of the work, and ultimately concluded because of the variations not only of the time spent at and away from the teller station, but because of the tasks that are performed and the way that those are interspersed, there simply was no way he correctly concluded for him to adjudicate the issue of the nature of the work on a class-wide basis. Okay. I have no other questions. Thank you very much. Mr. Rubin, you again. The record shows, and the judge found on page 13, that no teller spent less than 50 percent of her or his time and no spent upwards of 90 percent of their time. And Your Honor is right as to what the focus was. Judge Silverman asked about whether there would be any class actions if Chase were right here. And I want to take that question and take it one step further. Because I think we've got an issue of materiality here that underlies it. Obviously, there has to be reversal because the wrong legal standard was applied. But I'd like to consider how an individual teller's case for suitable seating would be proven if all of these factors that's popping up matter so much. The reality is that this is a job, like many jobs, where we concede there is some movement. It's mostly a sedentary job. But an individual over the course of each day does her teller work in a different order. And the next day does it in a different order. But it's the same general mix of tasks. And that is what Michael Andrews, the Rule 30b-6 deponent, said. The core common tasks are the same. There is variation day to day. I sat down longer during some arguments than I sat down during others. There's always some variation. It's not a material variation. If you apply the pay period standard under PAGA and you look at what they principally do, and you know that they spend at least 50% up to 90% of the time at the teller stations, then most of what they can do can be done while seated. Again, we may win. We may lose. But everyone, according to their own deponents, their own designees, say they do the same basic stuff. And it requires them to pop up at roughly the same intervals. We have records that show ER 34 to 36, shows the ATM and the TCD. We also have the fact that they conducted. Well, what about the people that have glass or have configurations where they can't sit at all? Sure. We'll start with the glass. There is no evidence that the bulletproof glass ever posed problems for any tellers with stools. The photos were at ER 42 to 46. There's only one witness who testified for Chase about the glass. That was Denise Dyes. And if you look at her declaration at page 171, she didn't have a stool. She had an ankle injury and was given a high chair. She had a problem because of a different type of seat. What Chase did is Chase conducted a survey of all of the available seating options for tellers and found that there were four different seats or stools that would work. They selected the criterion seat, which is the one that was used, that was given to all of the medically accommodating people except for that one individual. There is no evidence that the bulletproof glass makes any difference at all. We responded in our briefs to Jenny Vu and Kim Henderson. I won't repeat that there. But the record shows that there was a threshold legal error made by the judge. Every single one of the medically accommodating people, according to Chase's own Rule 30b-6 designee, Linda Shibbets, said there were no problems. There were no complaints. The only complaints in the record are those reported by Michael Andrews, another Rule 30b-6 deponent, who said that people complained when they had been working for Washington Mutual and their seats were taken away from them when Chase took over after PAGA went into effect. Unless there are any more questions, I shall sit down. Thank you. Thank you. Thank you. Ms. Boucher, thank you. Ms. Duong, thank you. You did a good job, too. You kept up the consistent good work of all counsel in this case. Thank you. We stand recessed.
judges: Silverman, Callahan, Smith